**Russ PYE; Lee Pye, Plaintiffs–Appellants,**

v.

**UNITED STATES of America; United States Army Corps of Engineers, Defendants–Appellees.**

**National Trust for Historic Preservation; Society for Historical Archaeology; American Cultural Resource Association, Amici Curiae.**

No. 98–2229.

United States Court of Appeals, Fourth Circuit.

Argued May 5, 1999.

Decided Oct. 22, 2001.

**ARGUED:** C.C. Harness, III, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Charleston, SC, for Appellants. Cornish F. Hitchcock, Washington, DC, for Amici Curiae. John Thompson Stahr, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for Appellees. **ON BRIEF:** Perrin Q. Dargan, III, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Charleston, SC, for Appellants. Elizabeth S. Merritt, Associate General, Edith M. Shine, Associate General, Laura S. Nelson, Assistant General, National Trust for Historic Preservation, Washington, DC, for Amici Curiae. Lois J. Schiffer, Assistant Attorney General, David C. Shilton, David L. Weigert, Lyn Jacobs, Environment and Natural Resources Division, United States Department of Justice, Washington, DC; Frank Jordan, District Counsel, United States Army Corps of Engineers, Charleston, SC, for Appellees.

Before WILKINSON, Chief Judge, and WIDENER and MOTZ, Circuit Judges.

Vacated and remanded by published opinion. Judge WIDENER wrote the opinion, in which Chief Judge WILKINSON and Judge DIANA GRIBBON MOTZ concurred.

## OPINION

WIDENER, Circuit Judge:

This is a suit brought by Russ and Lee Pye, seeking to require the Corps of Engineers to conform to statutory and regulatory requirements before issuing a permit to construct a road crossing within the waters of the United States. The Pyes own adjoining land to the land on which the road crossing is constructed. Their land also adjoins what is known as Tract M of the Sheppard Tract on which an eighteenth century plantation house connected to the Hayne family is situated and is near to, a matter of several hundred feet, the site of an African American cemetery owned by Westvaco. The cemetery itself adjoins the Pyes' land and is probably partly on the Pyes' land. The old plantation house is eligible for the National Register of Historic Places, as is the African–American cemetery.

The district court dismissed the Pyes' complaint for lack of standing. We are of opinion such dismissal was error, and we vacate and remand for consideration of the merits of the Pyes' complaint.

## I.

The series of events giving rise to this litigation stems from the County's proposal to improve an existing dirt access road (the road) leading from United States

Highway 17 [1] to the southwest corner of an approximately 750–acre tract of the County's land called the Sheppard Tract. See Ex. A. to this opinion. The improvements affect all of the access road, which is owned by the County and open to private use only with County permission. A .23–acre segment of the road is covered by waters of the United States. The road runs along the west side of the Sheppard Tract and cuts through it at its southwest corner, northwest corner, and northern end. The road leads directly from U.S. Highway 17 to a 33–acre field, designated Area M, at the southwest corner of the Sheppard Tract. Area M contains the remains of an eighteenth century plantation home site. The Pyes' property is adjacent to Area M and contains part of an historic African American cemetery. Both the plantation home site and that of the cemetery have been declared eligible for entry on the National Register of Historic Places. The Sheppard Tract, the Pyes' property, and other adjacent property are all part of a larger area known as Encampment Plantation. Encampment Plantation has historic significance because in addition to containing the eighteenth century plantation home remains, the graveyard, and other historic sites, it may have been the location where troops were stationed during the Revolutionary War to guard South Carolina's state government which met across the Edisto River during the British occupation of Charleston.

In order to improve access to Area M, the County proposed to fill the 0.23 acres of wetland occupied by the road, to grade the road, and to install a culvert to permit drainage under the improved road. Because the project involved filling wetlands, the County had to obtain a permit from the Corps under section 404 of the Clean Water Act, 33 U.S.C. § 1344.[2]

The permitting process began on October 23, 1991 when the County initially applied for a permit to fill the wetlands. At this time, the County intended to use the road in connection with the construction of an ash monofill [3] on the Sheppard Tract. The County retired (apparently meaning withdrew) the application for the ash monofill on July 1, 1993. On January 24, 1995, the County applied for a Nationwide Permit 14 under section 404 of the Clean Water Act to improve the road, indicating that it now planned to use the land at the end of the road for a dirt borrow pit [4] and, later, for training police dogs. On April 20, 1995, the Advisory Council on Historic Preservation (the Advisory Council) notified the Corps that the road improvement might have an effect on Encampment Planation, which would include the eighteenth century plantation

---

1. We take judicial notice that Highway U.S. 17 is a major coastal high-way running at least from Florida to Virginia through South Carolina.

2. The Clean Water Act prohibits the discharge of dredge or fill material into the waters of the United States, which include wetlands, without a permit from the Corps. 33 U.S.C. § 1344 (1994); 33 C.F.R. § 328.3(a), (b) (1998).

3. "A monofill is a landfill which only accepts municipal waste combustion ash." Denise L. Stoker, Note, *The Burning Dilemma of Incinerator Ash Disposal:* City of Chicago v. Environmental Defense Fund, 3 Wis. Envtl. L.J. 67, 70 n. 13 (1996) (citing Haia K. Roffman, Monofill, in *The Encyclopedia of the Environment,* 458 (Ruth A. Eblen & William R. Eblen eds., 1994)).

4. A dirt borrow pit is a pit used to supply earth for filling or embanking projects. See C. Conrad Claus, *Oregon's Development of Absolute Liability Under the Rylands Doctrine: A Case Study,* 53 Wash. U.J. Urb. & Contemp. L. 171, 196 n. 162 (1998) (citing *Webster's Third New International Dictionary of the English Language* 257 (3d ed.1993)).

home remains, a site that was either included in, or eligible for, the National Register of Historic Places. Additionally, the County had commissioned a cultural resource survey of the Sheppard Tract, obviously to determine the historical value of the area. The survey revealed that the eighteenth century plantation home site could be eligible for listing in the National Register of Historic Places, along with other sites in the area. After receiving the results of the survey in May 1996, the County abandoned its plans to create the dirt borrow pit. As of July 1996, the County intended to use the road to access Area M only for conducting routine maintenance of the land and for training police dogs.

The Corps forwarded the County's permit application on July 31, 1996 to the United States Department of the Interior, Fish and Wildlife Service; the State Historic Preservation Office; the Environmental Protection Agency, Wetlands Regulatory Unit; the South Carolina Department of Natural Resources; the United States Department of Commerce, National Marine Fisheries Service; and the South Carolina Department of Health and Environmental Control, Office of Ocean and Coastal Resource Management. Both the National Marine Fisheries Service and the Fish and Wildlife service responded to the Corps concerning the project's effects, as required under section 7 of the Endangered Species Act. 16 U.S.C. §§ 1531–43. The Deputy State Historic Preservation Officer also responded and indicated that the eighteenth century plantation home site was eligible for listing on the National Register of Historic Places. On January 23, 1997, the United States Department of the Interior, National Parks Service, found the Hayne Plantation site and the African American cemetery site eligible for listing on the National Register of Historic Places and informed the Corps of that decision by copy of that letter. The letter indicated that the Service did not find that the area was eligible for listing as a rural historic district.

The Pyes filed a complaint in the United States District Court, District of South Carolina on February 19, 1997 alleging that the Corps failed to complete all the required steps under federal law prior to granting the County the Nationwide Permit 14. They asserted federal question jurisdiction under 28 U.S.C. § 1331 and because the United States was a defendant. They sued under The Administrative Procedure Act, 5 U.S.C. § 702; The Clean Water Act, 33 U.S.C. § 1251, et seq.; The National Historic Preservation Act, 16 U.S.C. § 470, et seq.; The National Environmental Policy Act, 42 U.S.C. § 4321, et seq.; and The Endangered Species Act, 16 U.S.C. § 1531, et seq. The Corps answered the complaint on April 25, 1997. In response to the litigation, the Corps suspended the permit on May 13, 1997 to confirm that it was properly authorized.

Under this further review, the Corps notified the Fish and Wildlife Service to confine its analysis concerning endangered species to Area M. The Fish and Wildlife Service, later that month, answered that it could not discern any adverse impact on Area M. On November 19, 1997, the Corps reinstated the County's Nationwide Permit 14, allowing it to complete the road improvement project. In reinstating the permit, the Corps did not consider the impact of the improvement on the historic site in Area M, or any other area, instead, confining its analysis to the "footprint"[5] of the

5. The "footprint" of the area to be filled consists only of the actual 100 foot stretch of road

roadway area to be filled, which did not contain any historically relevant sites.

After reinstatement of the permit, the Corps moved for summary judgment on February 10, 1998. The district court granted summary judgment in favor of the Corps and dismissed the complaint, finding that the Pyes did not have standing to bring this action because they did not demonstrate either an injury in fact, causation of an injury by the Corps, or the ability of the court to redress an injury. *Pye v. United States, Army Corps of Eng'rs*, No. 2:97–00431–2 (D.S.C. July 24, 1998). The County advises us that it has completed the road improvement project, however the Corps freely admits that the wetland fill is easily removed. Having considered the record, and after oral argument, we are of opinion that the Pyes have standing to bring their suit, and we vacate and remand.

Before discussing the question of standing, it is well that we recount some principal facts.

The Pyes' property is adjacent to the property on which the wetland fill at issue here is located. Their property also is adjacent to Area M on which is located the remains of the ante-bellum Hayne Plantation. It also adjoins the African–American cemetery and probably includes a part of the cemetery. Both the remains of the plantation and the African–American cemetery are eligible for inclusion in the National Register of Historic Places.

Area M and the cemetery are located only some%10 of a mile off of U.S. 17, a major coastal highway.

On August 12, 1996, the Fish and Wildlife Service of the Department of the Interior advised the Corps that the proposed permit "not be authorized without Service concurrence that the activity is not likely to affect federally protected species." The Fish and Wildlife Service was of opinion that the entire Sheppard tract be considered "the action area of the project." It took that position because it was "concerned about the secondary impacts of development within the 750.02–acre tract that may ensue as a result of improved access." That letter stated that the public notice did not clearly describe what type of development would occur at the site and recommended that "to avoid piece-mealing project development, we recommend that all project plans be reviewed up front to determine compliance with state and federal regulations. We recommend that a wetland master plan be prepared and submitted to the source agencies for further review." It opposed issuance of the permit until its listed agencies were addressed. The Corps never addressed that position.

The ante-bellum plantation site and the African–American cemetery site are both within a few hundred feet of the road which is the issue here. There was evidence aplenty in the district court, in the Garrow Report, that a significant part of the historical value of both the African–American cemetery and the Hayne plantation site was that neither, because of their location, had been subject to marauders:

> *Feeling* [in finding a rural historic landscape] incorporates all of the above attributes. A general test for feeling is whether the site or district could serve as a teaching example, without the need to ignore major post-occupational changes. The feeling of the proposed district is very strong; it is one of the few tracts in the county with well-preserved remains from the planter's house, slave settlement, upland fields, rice fields, and associated infrastructure

containing wetlands. This 100 foot stretch of road does not contain any historic sites.

without alteration by post-bellum or modern occupation or use.

(A. Part 1, p. 68 with respect to the Hayne Plantation.)

The cemetery also is a good example of a distinctive, regionally important type of cemetery. The African American tradition of grave decorations/grave goods was strongly followed, and most of these goods have been preserved beneath recently developed topsoil. The site has not undergone the disturbance or removal of grave goods that commonly occurs as part of a misguided effort to "clean up" a burial ground. The cemetery can serve as a well-preserved example of a community cemetery of rural African Americans who followed a well-entrenched set of rules regarding burial customs. The cemetery was apparently not linked to a specific church, as were many later African American cemeteries, and it was not a single-family cemetery. Rural African American cemeteries of the antebellum and postbellum periods were once a common element of the Southern landscape, but many have been lost from memory, removed, or impacted by development or logging. As a cemetery that embodies the distinctive characteristics of the Sea Coast African American type, site 38CH1590 is recommended as eligible under Criterion C.

(A. Part 1, p. 79–80 with respect to the African–American cemetery.)

We also note that the County commenced with proposing Area M for an ash dump and both improving and paving the road to U.S. 17. As opposition developed, it changed the proposed use to a dirt mine and later changed the proposed use to a dog-training facility. The degree of improvement of the road was changed from a paved road merely to an improved road. The Corps has described the project as "to improve an existing roadway and to make it an all-weather road."

Despite the fact of objections to the Corps' lack of addressing the impact of the road on the wetlands of the entire Sheppard tract and the effect of improved and easier access to the historical sites, the Corps addressed neither prior to issuing the permit, choosing instead to confine its consideration to what it calls "the footprint," which is the actual fill of the wetland area, only without regard to any of the surrounding countryside, except, perhaps, Area M.

## II.

We review the district court's grant of summary judgment *de novo*. *Marshall v. Meadows*, 105 F.3d 904, 905–06 (4th Cir.1997). Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The core goal of the standing inquiry is to ensure that a plaintiff bringing an action has enough of a stake in the case to litigate it properly. In cases brought under the Administrative Procedure Act, the standing inquiry includes both a constitutional analysis and a prudential inquiry. See *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *GBA Assoc. v. General Servs. Admin.*, 32 F.3d 898, 900 (4th Cir.1994) (quoting *Motor Coach Indus., Inc. v. Dole*, 725 F.2d 958, 963 (4th Cir.1984)). Thus, to demonstrate standing in the context of the Administrative Procedure Act, not only must a plaintiff show that he has suffered an injury in fact that is fairly traceable to the defendant's conduct and that a court

can provide relief to redress the injury, but also he must show that the injury in fact is within the zone of interests protected by the statute. *Motor Coach Indus.,* 725 F.2d at 963 (citing *Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

### A.

■ To demonstrate standing at the summary judgment stage, a plaintiff must set forth evidence of an injury in fact in addition to that provided in the complaint, which will be taken as true for purposes of deciding the motion. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). This injury must be concrete, particularized, and not conjectural or hypothetical. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (internal citations omitted). A part of the Pyes' support for their allegations of standing were the affidavits of Mrs. Lee Pye and Dr. Michael Trinkley, a professional archaeologist. These documents, together with other documents in the record, explain that the Pyes own land next to, and probably including, an area containing designated historic sites and allege that the road improvements authorized by the Corps' permit will adversely affect that historic area. Dr. Trinkley asserted that the improved road will affect the historic cohesiveness of the area and will, by providing better access, result in the presence of more looters at the historic sites. Additionally, the Pyes have alleged that their interests in the cohesiveness and integrity of the historical sites were further impaired by the Corps' failure to consider the effect on the sites of the issuance of the permit, and the failure of the Corps to allow public participation and commentary by the Advisory Council as mandated by the Act and the Corps' own regulations.

In this context, both our decisions and decisions of the Supreme Court indicate that adjacent landowners often have standing to challenge the government's failure to follow statutorily prescribed procedures so long as this failure impairs a separate concrete interest of the plaintiff. See *Lujan v. Defenders of Wildlife,* 504 U.S. at 571–73, 112 S.Ct. 2130. For instance, in *Lujan,* the Court explained that "under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130. Indeed, in such cases standing to sue is so self-evident that the Supreme Court often has dispensed with the inquiry altogether. See, e.g., *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 336, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (no question made of standing for a Citizen's Council of the vicinity to challenge the contents of environmental impact statement). See also *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130 (noting that in *Robertson,* Court did not address standing "for the very good reason that the plaintiff was a citizens' council for the area in which the challenged action was to occur, so that its members would obviously be concretely affected"). Likewise, in *Waterford Citizens' Assn. v. Reilly,* 970 F.2d 1287 (4th Cir.1992), we held that nearby plaintiffs have standing to challenge failures of agencies to comply with the National Historic Preservation Act. *Waterford* involved an organization of citizens concerned about the effect of an EPA decision to allow a developer of townhouses outside of the town of Waterford to hook into Waterford's sewer system. In

permitting the hook-up, the EPA failed to comply with a Memorandum of Agreement it had voluntarily made with various historic preservation agencies. *Waterford,* 970 F.2d at 1289. The Memorandum of Agreement essentially reopened the Section 470f consultation process, the same process at issue in the instant case. In *Waterford,* we held that the plaintiffs "clearly [had] standing to bring this issue to court." 970 F.2d at 1288 n. 1, 1290. We did not require that the residents demonstrate that they lived in the vicinity of the project at issue.

Such a holding is not unique to this Circuit, moreover. The Third Circuit has held that a group of residents living in the historic district of Society Hill in Philadelphia had standing to challenge Housing and Urban Development's grant to the city to build a hotel and parking garage in the residents' neighborhood. See *Society Hill Towers Owners' Association v. Rendell,* 210 F.3d 168, 176–77 (3rd Cir.2000). The plaintiffs in *Society Hill Towers* alleged that the building of the hotel and garage would injure them by increasing traffic, pollution and noise, impair the use and enjoyment of the historic district, and decrease their property values. *Society Hill Towers,* 210 F.3d at 176. The court found that these plaintiffs clearly had standing, stating "[i]f the Residents do not have standing to protect the historic and environmental quality of their neighborhood, it is hard to imagine that anyone would have standing to oppose this … grant. If that is the case, the requirement for … public input would be little more than a meaningless procedural calisthenic that would provide little or no protection to those most directly affected by the governmental action." 210 F.3d at 176.

■ We think the Pyes have demonstrated an injury comparable to the injuries demonstrated by the Waterford and Society Hill Towers plaintiffs. The Pyes are not only in the vicinity of the proposed action, but are adjacent landowners. The Keeper has designated adjoining and what is probably a portion of their land as eligible for listing on the National Register along with the individual site contained in the Sheppard Tract. Most importantly, however, the eligible African American cemetery abuts directly the Pyes' land, and probably overlaps it. Therefore, the challenged action may lead to trespassing, vandalism, and looting of historic sites not only on the Sheppard Tract, but also to the historic site on the Pye property. The Pyes are the people most directly affected by the challenged action, and if they do not have standing, to see that the government complies with the regulatory provisions, then the National Historic Preservation Act's requirement for consideration of the effect of federal permits on historic places is merely a "procedural calisthenic." We decline to so hold.

The Corps endeavors to undermine the concreteness of the Pyes' injury by arguing that any development by the County is speculative and that the construction project itself will not actually destroy any of these historic sites. The Corps' arguments in this regard are unavailing, however. It is abundantly clear from the record that the county wishes to use this 750 acre parcel for something. At different times the County has planned a borrow pit, an ash dump, and a canine training center. The road construction is but the first step in future development by the County. No reason is advanced that this road will remain a road to nowhere for long. We cannot say that future development enabled by the Corps' permit is so speculative as to render the Pyes' allegations of injury abstract.

Similarly, that the proposed project will not actually touch any of the historic sites

on either the Sheppard Tract or the Pyes' property is of no moment. The plaintiffs in both *Waterford* and *Society Hill Towers* alleged a range of harms to the historic areas concerned. The plaintiffs in *Waterford* alleged that the actions would physically destroy historic sites. 970 F.2d at 1289. In *Society Hill Towers,* however, the plaintiffs only complained of the effect on the historic area in general, not destruction of any historic sites. *Society Hill Towers,* 210 F.3d at 176. Even if no shovels or backhoes will touch either historic area, damage to historic areas can occur in less direct ways. Indeed, the Corps' own regulations embrace this by mandating consideration of "the effects of undertakings on any known historic properties that may occur outside the permit area." See, e.g., 33 C.F.R. pt. 325, Appendix C, 5(f). Directness, while it may be relevant to causation and to extent of damages, is irrelevant to the presence of injury-in-fact. While at first blush the project here may appear to be trivial, the smallest of endeavors can have enormous consequences if undertaken improvidently. We caution the district court not to yield to the temptation of necessarily equating the size of the government's action with its potential for injury.

Finally, the fact that the Pyes' aesthetic concerns pertaining to the integrity and cohesiveness of the historic district and individual sites are also widely held by the populace of the County does not render them any less concrete and particularized as to the Pyes. The Supreme Court has held that aesthetic and environmental injuries can constitute an injury in fact sufficient to support a plaintiff's standing. See *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610, 68 U.S.L.W. 4044, 4049 (2000) (citing *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)); *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 73–74, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (environmental and aesthetic consequences to lake provided sufficient injury for standing). While it is true that the Court has stressed that a generalized grievance shared by the population at large cannot be a basis for standing, see *Duke Power,* 438 U.S. at 80, 98 S.Ct. 2620, it is equally true that merely because an injury is widely held does not necessarily render it abstract and thus not judicially cognizable. See *Federal Election Comm'n v. Akins,* 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) (finding standing for voters alleging participation in the same elections to question the status of a committee as a political committee under the statute). So long as the plaintiff himself has a concrete and particularized injury, it does not matter that legions of other persons have the same injury. See *Akins,* 524 U.S. at 24, 118 S.Ct. 1777. In short, the Pyes' injuries do not stem from a "common concern for obedience to law," *Akins,* 524 U.S. at 23, 118 S.Ct. 1777, but from individual concerns about the integrity and cohesiveness of historical sites in their own backyard.

In light of the foregoing, we are of opinion that the Pyes have alleged sufficiently concrete injuries to establish the first prong of the standing inquiry.[6]

### B.

Because the Pyes established an injury in fact, we turn to a prudential

---

**6.** We note that we do not hold in this case that the violation of a procedural duty is enough to confer standing on an adjacent landowner *per se.* Here there is a concrete injury from the completion of the proposed project separate from the failure of the government agency to undertake its duties. As we have shown, the Pyes have met this requirement.

inquiry to determine whether their injury is within the zone of interests targeted by the National Historic Preservation Act. The zone of interests test consists of a two part inquiry: first, determining which interests the statute at issue arguably protects and second, determining whether the agency action affects those interests. *TAP Pharm. v. United States Dep't of Health and Human Servs.*, 163 F.3d 199, 203 (4th Cir.1998) (citing *National Credit Union Admin.*, 522 U.S. at 492, 118 S.Ct. 927). The National Historic Preservation Act is a relevant statute under the Administrative Procedure Act for the purposes of applying the zone of interests test. See *Ely*, 321 F.Supp. at 1092 (citing *Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970)).

The purpose of the National Historic Preservation Act is to remedy the dilemma that "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency." 16 U.S.C. § 470(b)(3). To remedy this problem, the Act prescribes the section 470f process, which requires federal agencies with the authority to license an undertaking "to take into account the effect of the undertaking on any ... site ... that is ... eligible for inclusion in the National Register" prior to issuing the license. 16 U.S.C. § 470f. In particular, the statute's regulations expressly provide that members of the public interested in the impacts of a federal license on an historic property are to have a reasonable opportunity to participate in the section 470f procedures. 36 C.F.R. § 800.1(a), 800.2(c)(4), (d)(1). The Corps' own regulations pursuant to the National Historic Preservation Act require it to "take into account the effects, if any, of proposed undertakings on the historic properties both within *and beyond* the waters of the U.S." 33 C.F.R. pt. 325 app. C(2)(a) (emphasis added). And we note

that that regulation just mentioned authorizes the Corps to condition the permit so as to minimize harm to the historic sites, which seems to have been overlooked in this case.

■ In this case, the Pyes have asserted an interest directly targeted by the National Historic Preservation Act and its regulations. As adjacent, and probably actual, property owners, they are members of the public concerned with the impact of the Nationwide Permit 14 on a historic site next to and on their property and want to ensure that the Corps takes into account the effects of the improved road on that site. Additionally, the Pyes' claims are similar to the plaintiffs' claims in *Society Hill Towers*, which the Third Circuit found were asserted within the zone of interests covered by the National Historic Preservation Act. See *Society Hill Towers*, 210 F.3d at 178.

Thus, the National Historic Preservation Act is aimed at the preservation of areas like the sites here, the African–American cemetery and the Hayne plantation, and expressly provides for interested members of the public to participate in the permitting process when those areas may be affected by agency action. See 36 C.F.R. § 800.2(d)(1). As such, we conclude that the Pyes' claims are within the zone of interests protected by the National Historic Preservation Act.

### C.

■ Plaintiffs must also show that their injury is fairly traceable to the defendant's conduct. *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003. The district court found that the Pyes failed to demonstrate the causation element because they did not present evidence indicating the extent to which looting would increase once the county improved the road. We disagree

with this analysis of the causation requirement.

Plaintiffs' injury is caused by the improved road, not the existing road, and but for the improvements on the road authorized by the Corps' permit, the injuries the Pyes complain of, an increased probability of looting and destruction of cohesion in the area, have less probability of occurring. The improvements must facilitate access, otherwise the County would not want them. If access is facilitated for the County, it will also facilitate access for other persons, including looters. The Trinkley affidavit provided evidence that linked looting with access to historic sites. While this evidence itself is sufficient to establish causation, the Pyes' injury is also directly traceable to the Corps' conduct because the Corps failed to consider the Pyes' input on the road improvements as required by the National Historic Preservation Act. See *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 161–62, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) (finding that causation element of standing inquiry existed in case in which agency breached its procedural duties by failing to consider options raised by plaintiffs).

## D.

Lastly, the Pyes must also show that the court can redress their injury with the requested relief in this case. *Steel Co.*, 523 U.S. at 103, 118 S.Ct. 1003. However, where the plaintiffs validly assert a procedural injury, they need not meet "the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130. That is to say, the Pyes need not establish that their cohesiveness and integrity injuries will be fully remedied by

a favorable decision by the court below, only that there is a procedural remedy by which the plaintiffs' concerns may be aired before the agency.

The National Historic Preservation Act Section 470f regulations give the Pyes an affirmative right to participate in the permitting process as consulting parties. 36 C.F.R. § 800.2(c)(6), (d)(1). The Army Corps is required to "take into account" the effects of the issuance of the permit on historic sites prior to making its final decision. 16 U.S.C. § 470f. In evaluating these effects, the Corps must seek the views of interested parties, including the Pyes and the Advisory Council, in (1) identifying historic properties potentially affected by granting the permit, (2) assessing whether those resources will be adversely affected by granting the permit, and (3) seeking ways to avoid and reduce harm to the affected resources. 36 C.F.R. §§ 800.4(a)(3), 800.5(a)(1–2)(vii), 800.5(d)(2). While the Pyes allege concerns about future development, they also raise concerns about the effect of the *improved* road itself, including the looting and destruction of the area's cohesiveness that would be considered if the Corps followed the National Historic Preservation Act's mandates. Thus, we may redress the Pyes' injury by requiring the Corps to comply with the procedures required by the National Historic Preservation Act.[7] See *Catron County Bd. of Commrs. v. United States Fish and Wildlife Service*, 75 F.3d 1429, 1433 (10th Cir.1996) (finding that court could redress environmental injuries by requiring federal officials to assess environmental impacts of project and potential alternatives). We therefore con-

---

7. We note that the plaintiffs need not show that the result of the agency's deliberations will be different if the statutory procedure is followed. See *Akins*, 524 U.S. at 25, 118 S.Ct. 1777. It is enough that Pyes be allowed to participate as consulting parties along with the Advisory Council and that the Corps exercise its powers lawfully.

clude that the Pyes have established the redressability requirement for standing.

### III.

We do not address the Pyes' additional argument for standing as private attorneys general because we find that the plaintiffs have standing on other grounds.

### IV.

The Pyes have adequately and amply established that they have been injured by the actions of the Corps in a concrete and particular way, that they are within the zone of interests served by the National Historic Preservation Act, and that their grievances are likely to be redressed by a favorable decision in this case. Therefore, the Pyes have demonstrated standing to bring the underlying suit, and we so hold.

The judgment of the district court is vacated and the case remanded for proceedings not inconsistent with this opinion.

*VACATED AND REMANDED.*