PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MIRANT POTOMAC RIVER, LLC,

*Petitioner,*

v.

THE UNITED STATES
ENVIRONMENTAL PROTECTION
AGENCY; LISA P. JACKSON,
Administrator, U.S. Environmental
Protection Agency,

No. 08-1277

*Respondents,*

COMMONWEALTH OF VIRGINIA ex rel.
ROBERT F. MCDONNELL,

*Intervenor.*

On Petition for Review of an Order of the
United States Environmental Protection Agency.
(EPA-R03-OAR-2007-0381; FRL-8510-3)

Argued: May 12, 2009

Decided: August 12, 2009

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Dismissed by published opinion. Judge Duncan wrote the
opinion, in which Judge Motz and Judge Gregory joined.

## COUNSEL

**ARGUED:** Jeffrey R. Holmstead, BRACEWELL & GIULI-ANI, LLP, Washington, D.C., for Petitioner. Jon Michael Lip-shultz, UNITED STATES DEPARTMENT OF JUSTICE, Environmental Defense Section, Washington, D.C., for Respondents. Carl Josephson, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Intervenor. **ON BRIEF:** Sonja Rodman, EPA Office of General Counsel, Washington, D.C., Neil Bigioni, EPA Office of General Counsel, Philadelphia, Pennsylvania; Ronald J. Tenpas, Assistant Attorney General, John C. Cruden, Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Environmental Defense Section, Environmental and Natural Resources Division, Washington, D.C., for Respondents. William E. Thro, State Solicitor General, Stephen R. McCullough, Deputy State Solicitor General, Roger L. Chaffe, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Intervenor.

---

## OPINION

DUNCAN, Circuit Judge:

Mirant Potomac River, LLC ("Mirant") appeals the Environmental Protection Agency's ("EPA") approval of Virginia's Clean Air Interstate Rule State Implementation Plan ("CAIR SIP"). Mirant's alleged injury, however, flows from Virginia's Nonattainment Provisions, which are separate emissions standards adopted by Virginia's Air Pollution Control Board ("Virginia Board") under the authority of the Virginia legislature. Because Mirant's injury cannot fairly be traced to EPA's approval of Virginia's CAIR SIP, we dismiss for lack of standing.[1]

---

[1]Since we find no subject matter jurisdiction, we need not evaluate a recent decision by Virginia's Court of Appeals that invalidated a portion

## I.

Mirant, which operates a coal-fired power plant in Alexandria, Virginia, challenges EPA's approval of Virginia's CAIR SIP as unlawful under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500 *et seq.* While a State Implementation Plan ("SIP") is a state's compliance program under the CAA, a "CAIR SIP" is a modification of a SIP that incorporates EPA's recently promulgated Clean Air Interstate Rule ("CAIR"). Virginia's CAIR SIP permits power plants to meet CAIR compliance obligations through the trading of emissions allowances[2] with other power plants.

However, Mirant's power plant must also meet the emissions standards promulgated under Virginia's Nonattainment Provisions because of the plant's geographic location in a nonattainment area. These Provisions do not permit allowance trading to meet state compliance obligations. Mirant claims that the Nonattainment Provisions are practically and legally a fundamental part of Virginia's CAIR SIP.

Mirant further argues that the Nonattainment Provisions interfere with its ability to meet its CAIR compliance obligations because these Provisions purportedly prohibit allowance trading to meet CAIR obligations. Because of space constraints at its power plant that allegedly limit Mirant's ability to install emissions controls, Mirant argues that it will ultimately be forced to close the plant if it is not permitted to meet its CAIR compliance obligations through allowance trading.

---

of the Nonattainment Provisions, 9 Va. Admin Code § 5-140-1061. *Mirant Potomac River, LLC v. Commonwealth of Virginia, State Air Pollution Control Board*, 2009 WL 1748524 (Va. Ct. App. June 23, 2009) (unpublished).

[2]An "allowance" is a permit to emit one ton of a given pollutant in a given year.

Mirant raises three issues on appeal, all grounded in alleged violations of the APA. First, Mirant challenges EPA's approval of Virginia's CAIR SIP without providing notice or the opportunity to comment on Virginia's Nonattainment Provisions. Second, Mirant argues that EPA acted arbitrarily and capriciously when it reviewed and approved the Nonattainment Provisions outside its public process. Third, Mirant alleges that EPA acted arbitrarily and capriciously in approving Virginia's CAIR SIP because the Nonattainment Provisions are both a part of the CAIR SIP and fundamentally incompatible with EPA's CAIR program. Mirant requests that we "vacate EPA's rule approving Virginia's CAIR SIP and direct the Agency to prohibit Virginia from implementing and enforcing the Nonattainment Provisions unless and until Virginia modifies its rules governing emissions from power plants to be consistent with federal requirements." Petr.'s Br. at 41. In the alternative, "Mirant requests that [we] remand the rule and require EPA to allow for public notice and comment on the full Virginia CAIR program, including the provisions at issue [i.e. the Nonattainment Provisions] in this case." *Id.* at 41-42.

## II.

EPA challenges Mirant's standing to bring this suit and argues that Mirant has failed to show an injury fairly traceable to EPA's actions. EPA maintains that Mirant's alleged injury does not flow from EPA's approval of Virginia's CAIR SIP, but instead flows from Virginia's independently promulgated and administered Nonattainment Provisions. Because we must satisfy ourselves of our jurisdiction, we address this question first. *See Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001).

In order to demonstrate standing, a party must show that "(1) it has suffered an injury in fact; (2) the injury is fairly traceable to the defendants' actions, and (3) it is likely, and not merely speculative, that the injury will be redressed by a

favorable decision." *Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 231 (4th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). To meet the injury in fact requirement, the party must demonstrate an injury that is "concrete and particularized, and actual or imminent, as opposed to conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560-61). An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control. *See Frank Krasner Enters. Ltd. v. Montgomery County*, 401 F.3d 230, 234-35 (4th Cir. 2005) (citation omitted). Finally, the burden of establishing standing "lies squarely on the party claiming subject-matter jurisdiction." *Id.* at 234.

In challenging EPA's approval of Virginia's CAIR SIP, Mirant argues that its injury stems from the Nonattainment Provisions' alleged prohibition on allowance trading, which Mirant argues prevents it from meeting its CAIR compliance obligations. Mirant attempts to establish the causal link between its alleged injury and the federally required SIP approved by EPA by arguing both that the "Nonattainment Provisions are a fundamental part of Virginia's CAIR program, both legally and practically," Petr.'s Br. at 18, and that these Provisions impermissibly interfere with EPA's CAIR program, *see* Petr.'s Br. at 16. For the reasons that follow, we disagree.

We describe below the relevant regulatory regimes—the SIP, grounded in federal law, and the Nonattainment Provisions, grounded in Virginia state law—and explain why Mirant has failed to establish an injury in fact that is fairly traceable to EPA's approval of Virginia's CAIR SIP.

A.

We begin with an analysis of the federal regulatory scheme. Title I of the CAA requires EPA to issue national ambient air

quality standards ("NAAQS") for each air pollutant that endangers, or may reasonably be anticipated to endanger, public health or welfare. 42 U.S.C. § 7408(a)(1)(A). The CAA also requires EPA to divide the country into areas designated as "nonattainment," "attainment," or "unclassified," based on whether the area meets the NAAQS. 42 U.S.C. §§ 7407(d).

Under Title I, states have the primary responsibility for assuring that air quality within their borders meets the NAAQS. Title I requires each state to create a State Implementation Plan ("SIP") to meet the NAAQS. The SIP is then submitted to EPA for approval. *See* 42 U.S.C. § 7410. Upon approval by EPA, the SIP becomes a binding federal regulation. 42 U.S.C. § 7413; *see also Union Elec. Co. v. E.P.A.*, 515 F.2d 206, 211 (8th Cir. 1975) ("Upon approval or promulgation of a state implementation plan, the requirements thereof have the force and effect of federal law and may be enforced by the Administrator in federal courts.").

Under the so-called "good neighbor" provisions of the CAA, states are also responsible for preventing in-state emissions "in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State." 42 U.S.C. § 7410(a)(2)(D). To address this concern, EPA promulgated the Clean Air Interstate Rule ("CAIR") in 2005. 70 Fed. Reg. 25,162 *et seq.* (May 12, 2005). CAIR applies to 28 states (plus the District of Columbia) that contribute significantly to other states' nonattainment.

CAIR gives these states the option of participating in a regional cap and trade program. Under this program, EPA sets an annual cap on the total number of tons of a pollutant (i.e., emissions allowances) that a state may emit. Each state then distributes emission allowances to individual power plants. These allowances establish each plant's maximum emissions for CAIR compliance purposes. Power plants can then trade—buy or sell—allowances for a variety of purposes,

including to meet current year CAIR compliance obligations, to use in the future, to invest, or to raise money. The program improves air quality by reducing the total emissions allowed over time.

All states subject to CAIR, including Virginia, have chosen to participate in this cap and trade program and have modified their SIPs accordingly. One important implication for these states is that, under CAIR, neither a state's SIP nor any independent state laws can directly interfere with EPA's cap and trade program; that is, they cannot place restrictions on a power plant's ability to engage in allowance trading to meet CAIR obligations. Power plants in these states are subject to specific federal penalties for failure to meet CAIR compliance obligations.[3] Virginia submitted its CAIR SIP to EPA early in 2007, and EPA approved it in December 2007.

B.

In addition to requiring states to propose and implement SIPs, the CAA expressly authorizes states to adopt unilateral emissions regulations as long as those regulations are no less stringent than those adopted in the state's SIP. The relevant portion of the CAA states:

> Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if

---

[3]In particular, CAIR provides that any source that exceeds its emissions allowance must surrender allowances sufficient to offset the excess emissions as well as allowances from the next control period equal to three times the excess emissions. 70 Fed. Reg. at 25,274; *see also* 9 Va. Admin. Code 5-140-1060(D)(1)-(2) (providing identical penalties for excess emissions under Virginia's CAIR SIP).

> an emission standard or limitation is in effect under
> an applicable implementation plan . . . such State or
> political subdivision may not adopt or enforce any
> emission standard or limitation which is less strin-
> gent than the standard or limitation under such plan.

42 U.S.C. § 7416. As the Supreme Court has observed, "Congress, consistent with its declaration that '[e]ach State shall have the primary responsibility for assuring air quality' within its boundaries, § 107(a), left to the States considerable latitude in determining specifically how the standards would be met." *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 86-87 (1975).

Virginia has adopted such additional standards. Virginia's Nonattainment Provisions impose emissions caps on individual power plants located within the state's nonattainment areas. *See* 9 Va. Admin. Code §§ 5-140-1061, -1062, -2061, -2062, -3061, -3062. Power plants may not trade allowances to meet their emissions caps under the Nonattainment Provisions. *See* 9 Va. Admin. Code §§ 5-140-1061(C), -2061(C), -3061(C). Virginia statutes provide a wide array of discretionary penalties for failure to comply with its emissions caps.[4] Like the state compliance obligation, this penalty regime is distinct from, and in addition to, the federal penalty regime under CAIR. Consistent with CAIR requirements, the Nonattainment Provisions explicitly prohibit restrictions on allowance trading to meet CAIR compliance obligations under the EPA administered cap and trade program. *See* 9 Va. Admin. Code §§ 5-140-1061(D), -2061(D), -3061(D).

Virginia originally planned to include its Nonattainment Provisions as part of its CAIR SIP. Consequently, the statu-

---

[4]*See* Va. Code § 10.1-1316 (providing for penalties of fines, injunction, mandamus, or "other appropriate remedy"); Va. Code § 10.1-1320 (providing for a penalty of fines). Individual plant permits may provide for additional penalties.

tory subsection authorizing the promulgation of the Nonattainment Provisions is part of the same statute that authorizes promulgation of Virginia's CAIR regulations (i.e., the set of regulations that modify Virginia's SIP to make it a CAIR SIP), and the Nonattainment Provisions themselves are numerically interspersed throughout these CAIR regulations.

Virginia eventually decided, however, to remove the Nonattainment Provisions from its CAIR regulations, making them independent state regulations. When Virginia submitted its CAIR regulations to EPA, it attached the Nonattainment Provisions with the explanation that it did so for informational purposes only. Virginia clarified during the public comment period on its CAIR regulations that, although the Nonattainment Provisions would set emissions limits for each power plant in nonattainment areas at levels equivalent to that power plant's CAIR allowances, the Provisions "place[ ] no restriction on participation by any affected unit in the EPA trading program" and "will not interfere with operation of the EPA CAIR trading program." J.A. 199; *accord* 9 Va. Admin. Code §§ 5-140-1061(D), -2061(D), -3061(D). Virginia also emphasized that its proposed CAIR SIP segregated "[1] compliance under the nonattainment area provisions from [2] compliance under the EPA trading program."[5] J.A. 199; *accord* 9 Va. Admin. Code §§ 5-140-1061(D), -2061(D), -3061(D). A power plant can therefore meet its federal emissions obligations under CAIR through allowance trading, even though it cannot use such trading to meet its state-imposed obligations under the Nonattainment Provisions.

Approximately six months after receiving Virginia's CAIR SIP and supporting documentation, EPA published a notice in

---

[5]As the Virginia regulations state, compliance with Virginia's Nonattainment Provisions (i.e., its state-mandated emissions caps) and compliance with the CAIR SIP "shall be determined separately and in accordance with the terms and provisions of each." 9 Va. Admin. Code 5-140-1061(D).

the Federal Register proposing to approve it. 72 Fed. Reg. 54,385 (Sept. 25, 2007). One of the documents that EPA included with its notice was an EPA Technical Support Document dated September 17, 2007. That document stated that EPA concluded that Virginia's Nonattainment Provisions did not impermissibly interfere with the federal cap and trade program. EPA noted:

> Virginia has established an emissions cap for EGUs [i.e., power plants] in the northern Virginia portion of the DC Nonattainment area. Such a cap is *within the flexibilities of CAIR*. The cap limits emissions of sources to the amount of allowances originally allocated by the Commonwealth. During the proposal phase of Virginia's rulemaking, EPA commented on the nonattainment area provisions, and Virginia modified the language pertaining to the emissions cap to address EPA's comments. However, Virginia has chosen not to submit its nonattainment provisions as part of its CAIR SIP revision, and EPA is not taking action on this portion of regulation [9 Va. Admin. Code § 5-140]. It is only mentioned here to note that *the state-only provision does not interfere with the trading program under CAIR*.

J.A. 397 (emphases added).

During the public comment period on EPA's proposed approval of Virginia's CAIR SIP, the Virginia Board held its own public proceedings on Virginia's Nonattainment Provisions at the state level. Mirant fully participated in the state proceedings but chose not to participate in the EPA proceedings. On December 28, 2007, EPA published a final rule approving the Virginia CAIR SIP. 72 Fed. Reg. 73,602 (Dec. 28, 2007).

C.

Having laid out the underlying statutory and regulatory framework, we now consider whether Mirant has met its burden of establishing standing to sue EPA for approving Virginia's CAIR SIP. Mirant claims that Virginia's Nonattainment Provisions prohibit covered plants from purchasing emissions allowances to comply with CAIR obligations. Because, in Mirant's view, the Nonattainment Provisions work in tandem with the CAIR SIP to circumscribe its options for meeting its CAIR obligations, the Nonattainment Provisions are an integral part of the CAIR SIP. Consequently, Mirant argues that EPA's approval of the CAIR SIP caused the injury of which it complains.[6] Mirant's arguments are fundamentally flawed for several reasons.

First, Mirant claims that the Nonattainment Provisions impermissibly interfere with Virginia's CAIR SIP. This claim is contradicted by the plain language of the Nonattainment Provisions. These Provisions, as we have pointed out, prohibit Mirant from allowance trading to meet its *state* compliance obligations, established under Virginia's independent emissions cap. *See* 9 Va. Admin. Code §§ 5-140-1061(C), -2061(C), -3061(C). The Nonattainment Provisions do not, however, directly interfere with Mirant's ability to trade allowances to meet its CAIR obligations. On the contrary, these Provisions explicitly prohibit any restrictions on trading to meet CAIR compliance obligations. *See* 9 Va. Admin. Code §§ 5-140-1061(D), -2061(D), -3061(D).

Second, Mirant argues that the Nonattainment Provisions are a fundamental part of Virginia's CAIR SIP. However, its arguments in this regard are also unpersuasive. For instance,

---

[6]Of course, any alleged injury that accrues to Mirant directly on account of the Nonattainment Provisions does not establish standing because such an injury does not arise out of EPA's decision to approve Virginia's CAIR SIP.

although Mirant points out that Virginia's CAIR SIP and its Nonattainment Provisions were authorized by the same state statute and proposed in the same legislative action, the explanation for these commonalities is straightforward and does not support Mirant's position. As noted above, the Nonattainment Provisions *were* once a part of Virginia's CAIR program and both programs have the same general goal of preventing air pollution. Mirant's emphasis on the common history and common subject matter of Virginia's Nonattainment Provisions and its CAIR SIP do not support a conclusion that the Nonattainment Provisions are *now* a fundamental part of that CAIR SIP.

Our analysis of the two regulatory schemes supports a conclusion that the two are separate. As discussed, each received final approval from different sovereigns through different processes; each has different compliance obligations that are enforced by these different sovereigns; each provides a separate penalty regime for noncompliance. As we have noted, the Nonattainment Provisions, as separate state regulations, do not place any restrictions on participation in the EPA trading program by any affected power plant. To meet *federal* compliance obligations, any power plant can buy, sell, trade, or use allowances without restriction. To meet *state* compliance obligations, no power plant located in a nonattainment area can exceed its independent state emissions cap without facing state penalties.

In summary, there is no connection—much less one that is "fairly traceable"—between Mirant's claimed injury and EPA's approval of Virginia's CAIR SIP because Virginia's Nonattainment Provisions and its CAIR SIP are separate regulatory schemes. Virginia's Nonattainment Provisions are state regulations. They are not part of, and do not directly interfere with, the CAIR SIP approved by EPA.[7] Consequently, Mirant

---

[7]To be sure, fines or other penalties issued under the Nonattainment Provisions might indirectly impact the affected power plant's capacity to

has failed to demonstrate a causal link between its alleged injury and EPA's approval of Virginia's CAIR SIP. Mirant has failed to carry its burden of establishing standing.

## III.

Because Mirant lacks standing, this petition for review is

*DISMISSED*.

---

fully engage in the trading program. For example, the fines might curtail a power plant's ability to purchase excess CAIR allowances for future use or for investment, or even make it unprofitable to continue operating the plant. Such indirect effects, as opposed to direct interference with the trading program or direct restriction on trading to meet CAIR obligations, are not fatal to the conclusion that the regulatory regimes are separate. Indeed, any time a state adopts regulations more stringent than required by CAIR, the regulations may have *some* impact on the CAIR trading program. CAIR is not intended to supplant these regulations. *Accord* EPA Technical Support Document at 7 (Sept. 17, 2007); *reproduced at* J.A. 397. At any rate, the precise point at which indirect impacts become unacceptable interference, if ever, is not an issue we need to resolve in this case. Virginia's regulatory scheme provides a diverse array of remedies and explicitly prohibits direct interference with the CAIR Annual Trading Program.